No. 14-35294

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

───────────────────────────────────

JO ELLEN PETERS and KEN LANE,

Appellants,

v.

AMAZON SERVICES LLC,

Respondent.

───────────────────────────────────

On Appeal From
United States District Court for the Western District of Washington
Case No. 2:13-cv-00480-MJP
The Honorable Marsha J. Pechman

───────────────────────────────────

**APPELLANT'S CORRECTED OPENING BRIEF**

───────────────────────────────────

Beth E. Terrell
Email: bterrell@tmdwlaw.com
Jennifer Rust Murray
Email: jmurray@tmdwlaw.com
TERRELL MARSHALL DAUDT
  &amp; WILLIE PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
Telephone: (206) 816-6603
Facsimile: (206) 350-3528

Britton D. Monts
Email: bmonts@themontsfirm.com
THE MONTS FIRM
The Frost Bank Building
401 Congress Avenue, Suite 1540
Austin, Texas 78701
Telephone: (512) 474-6092
Facsimile: (512) 692-2981

*Attorneys for Appellants*

## CORPORATE DISCLOSURE STATEMENT

Plaintiffs-Appellants are individuals with no corporate affiliations.

# TABLE OF CONTENTS

**Page No.**

I.    JURISDICTION ........................................................................1

II.    ISSUES PRESENTED ................................................................1

III.    FACTUAL BACKGROUND.......................................................2

IV.    PROCEDURAL HISTORY ......................................................18

V.    SUMMARY OF THE ARGUMENT.........................................19

VI.    ARGUMENT............................................................................20

     A.    The district court erred in finding that Plaintiff Lane agreed to arbitrate disputes over the 2010 Account..........................................22

         1.    The BSA's Arbitration Provision Does Not Apply Retroactively ...............................................29

     B.    The district court erred in finding that the BSA demonstrated Plaintiffs' agreement to arbitrate.......................................32

VII.    CONCLUSION.........................................................................41

# TABLE OF AUTHORITIES

Page No.

## FEDERAL CASES

*AT&T Mobility LLC v. Concepcion,*
  131 S. Ct. 1740 (2011).................................................................1

*Christianson v. Poly-America, Inc.*,
  No. Civ.02-1384(RHK/AJB),
  2002 WL 31421684 (D. Minn. Oct. 25, 2002)..........................................38

*First Options of Chi. Inc., v. Kaplan,*
  514 U.S. 938 (1995)........................................... 21, 22, 23, 27, 36

*Granite Rock Co. Int'l Bhd. of Teamsters*,
  561 U.S. 287 (2010)................................................21, 27, 37

*Green v. W.R.M. & Associates, Ltd.,*
  174 F. Supp. 2d 459 (N.D. Miss. 2001) .....................................30

*Green Tree Fin. Corp.-Ala. v. Randolph,*
  531 U.S. 79 (2000)........................................................1

*Hendrick v. Brown & Root, Inc.,*
  50 F. Supp. 2d 527 (E.D. Va. 1999) ....................................... 25. 26. 27, 29

*Kilgore v. KeyBank Nat. Ass'n,*
  718 F.3d 1052 (9th Cir. 2013) ..................................................22

*Lee v. Intelius, Inc.,*
  737 F.3d 1254 (9th Cir. 2013) ..................................................20

*MediVas, LLC v. Marubeni Corp.,*
  741 F.3d 4 (9th Cir. 2014) ..........................................................1

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,*
  460 U.S. 1 (1983)...........................................................21

- iii -

*Murphy v. DirectTV, Inc.,*
    724 F.3d 1218 (9th Cir. 2013) ...................................................................20

*Omstead v. Dell,*
    594 F.3d 1081 (9th Cir. 2010) ....................................................................1

*Peerless Imps., Inc. v. Wine, Liquor & Distillery Workers Union Local One,*
    903 F.2d 924 (2d Cir. 1990) .....................................................................26

*Stephens v. TES Franchising,*
    No. 301CV2267(JBA), 2002 WL 1608281 (D. Conn. July 10, 2002).......38

*United Steelworkers v. Warrior & Gulf Navigation Co.,*
    363 U.S. 573 (1960)..................................................................................21

*Wagner v. Stratton Oakmont, Inc.,*
    83 F.3d 1046 (9th Cir. 1996) ........................................................23, 28, 32

*Whisler v. H.J. Meyers & Co.,*
    948 F. Supp. 798 (N.D. Ill. 1996)..............................................................30

## STATE CASES

*Berg v. Hudesman,*
    801 P.2d 222 (Wash. 1990) .................................................................36, 41

*Brown v. Prime Constr. Co.,*
    684 P.2d 73 (Wash. 1984) .........................................................................32

*Cont'l Ins. Co. v. PACCAR, Inc.,*
    634 P.2d 291 (Wash. 1981) .......................................................................36

*Emter v. Columbia Health Servs.,*
    819 P.2d 390 (Wash. App. 1991) ..............................................................36

*Franciscan Med. Grp. v. Premera Blue Cross,*
    122 Wash. App. 1045 (2004)................................................................25, 29

*Mut. Reserve Ass'n v. Zeran,*
    277 P. 984 (Wash. 1929) ............................................................................24

*Navlet v. Port of Seattle,*
    194 P.3d 221 (Wash. 2008) ........................................................................32

*Olympia Police Guild v. City of Olympia,*
    805 P.2d 245 (Wash. App. 1991) ...............................................................37

*Pierce Cty,*
    185 P.3d 594 (Wash. App. 2008) ...............................................................36

*Seaborn Pile Driving Co. v. Glew,*
    131 P.3d 910 (Wash. App. 2006) ...............................................................38

*Schweitzer v. Schweitzer,*
    937 P.2d 1062 (Wash. 1997) ......................................................................37

*Syputa v. Druck Inc.,*
    954 P.2d 279 (Wash. App. 1998) ...............................................................37

## FEDERAL STATUTES

9 U.S.C. § 2 .................................................................................................21

9 U.S.C. § 16 .................................................................................................1

28 U.S.C. § 1332 ...........................................................................................1

## STATE STATUTES

RCW 19.230.330................................................................................4, 18

## I.   JURISDICTION

The district court had jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because the aggregate amount in controversy exceeds five million dollars and Plaintiffs and the Defendant are citizens of different states. This Court has jurisdiction under 9 U.S.C. § 16(a)(3). *MediVas, LLC v. Marubeni Corp.*, 741 F.3d 4, 7 (9th Cir. 2014) ("[A]n order compelling arbitration may be appealed if the district court dismissed all underlying claims, but may not be appealed if the court stays the action pending arbitration."); *see also Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 89 (2000) (where the district court has "ordered the parties to proceed to arbitration, and dismissed all the claims before it, that decision is 'final' within the meaning of § 16(a)(3), and therefore appealable"); *Omstead v. Dell*, 594 F.3d 1081, 1085 (9th Cir. 2010), abrogated in part by *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740 (2011) (the appropriate order by which plaintiffs may obtain appellate review of an order compelling arbitration is a voluntary dismissal with prejudice under Federal Rule of Civil Procedure 41(a)(2)).

## II.   ISSUES PRESENTED

1.     Where a limited liability company entered into a contract with Amazon containing a mandatory arbitration clause, and a member of the LLC had an existing individual contract with Amazon that did not require arbitration, can

the contract with the LLC be used by Amazon to impose arbitration on the individual?

2.     Assuming the answer to (1) is "yes", did a mandatory arbitration clause in a subsequent contract (one creating a new and separate relationship between the parties and entered into only after the first contract and relationship had been terminated) require arbitration of the plaintiff's claims that had already arisen under an earlier contract between the parties that did not contain a mandatory arbitration clause?

3.     Did both plaintiffs agree to arbitrate their claims with Amazon when the broad, general agreement at issue provides that any conflict in terms is governed by the policies applicable to the parties' relationship and, in the instant case, one incorporated written policy does not require arbitration and instead expressly permits suits in federal court in King County, Washington?

## III.     FACTUAL BACKGROUND

This appeal concerns whether Plaintiffs, who contracted with Amazon to be "third-party sellers" through its website, agreed to arbitrate their claims against Amazon.  ER 1.  Plaintiffs allege claims that arose under contracts entered into with Amazon both before and after November 3, 2011.  ER 346–48.  Prior to November 3, 2011, when an individual signed up to be an Amazon seller, the individual did so under Amazon's Marketplace Participation Agreement

("Participation Agreement").  ER 104–13, 326–33.  The Participation Agreement

contains a forum selection and choice of law provision expressly setting venue in

federal court in King County, Washington, ER 111, 332, but no arbitration clause.

 After November 3, 2011, Amazon began requiring all new sellers—including

individuals—to accept the Amazon Services Business Solutions Agreement

("BSA") in order to sign up to become an Amazon seller.  ER 301–22.  Although

the new BSA included an arbitration clause, it also provided that "[i]n the event of

any conflict between this the Program Policies and this [BSA], the Program

Policies will prevail. . . ." ER 304–05.   A conflict exists because the Participation

Agreement, a "Program Policy" a defined by the BSA, expressly permitted a seller

to bring suit in federal court in King County, Washington.  ER 111, 332.

Amazon solicits people to market and sell their goods on the popular

Amazon.com website.  ER 324, 344.  Plaintiffs Lane and Peters became "Amazon

sellers" of products on Amazon's online marketing platform at different times.  ER

14–17, 260–62, 346–48.  This dispute began when Amazon abruptly suspended

and permanently terminated Plaintiffs' seller accounts, and kept Plaintiffs' money

(that had been earned by Plaintiffs from goods sold and shipped) for over 90 days.

ER 342–48.  Plaintiffs claim Amazon breached the terms of the seller agreement

requiring seller funds to be disbursed within 14 days, and also violated the 10 day

disbursement rule under the Washington Uniform Money Services Act

("WUMSA") (RCW 19.230 *et seq*).[1]  ER 342–48, 353–64.

To become a seller, Amazon requires a "clickwrap" agreement; the potential

seller must first click on a box appearing on her computer screen to reflect her

agreement to be bound by the online seller agreement appearing on Defendant's

website.  ER 50, 156, 304–05 (describing the process under the BSA).

Potential sellers also must agree to use Amazon's payment service, giving

Amazon complete control over all monies generated by online sales.  ER 327, 344.

Since buyers on Amazon.com must pay for their purchases using credit or debit

cards, Amazon, first obtains an "authorization" from the purchaser's credit or debit

card to guarantee payment for a period of time.  ER 344.  Once a seller confirms to

Amazon that the order has been shipped, Amazon "captures" the funds from the

purchaser's credit or debit card.  *Id.*  Because the credit card processing business

operates 24/7, once the money is captured Amazon receives the money almost

immediately.  *Id.*  At that point, Amazon has possession of 100% of the sales

proceeds, which are deposited into its own bank accounts.  ER 343–44.

Amazon is supposed to remit most of the money to sellers within a few days,

keeping a portion (usually 15–20%) as its fee for use of its online sales platform.

ER 327–29 (describing the Amazon payment service).  In the case of Plaintiffs and

---

[1] Numerous complaints have been filed with the WA AG office about Defendant's business practices and a substantial number of those complaints relate to lengthy and improper holds on seller funds by Defendant.  ER 353.

the putative class, Amazon held their money well over 90 days. ER 347–48.
Because the funds are not held in escrow, they are available to Amazon to use as it
pleases. ER 343.

The individual sums of money held by Amazon for 90 days or more range
from a few dollars to thousands of dollars, hardly enough to justify a lawsuit by a
single seller. ER 343. What makes the practice so lucrative is the scale. *Id.*
Amazon is widely known to earn little if any net profits despite monumental
annual sales growth. Amazon reportedly generated over $20 billion in third party
sales in the fourth quarter of 2012 alone. ER 343. Third party sales are believed to
equal or exceed Amazon's own sales of over $60 billion. *Id.* That means Amazon
has free use of over $160 million of seller funds in its bank accounts every single
day of the year as interest-free operating capital. *Id.*

The issue in this appeal is whether a mandatory arbitration clause in the BSA
governs disputes between the parties, or does the federal court forum selection and
Washington choice of law provision, ER 332, in the Participation Agreement
control the venue for conflict resolution. The Participation Agreement is not a
secret agreement; rather, it is the agreement one finds most easily when
researching selling on Amazon's website either by visiting the "Selling on
Amazon" section of the Amazon website, or using a search engine such as

Google.[2] ER 92–95, 98–112. In contrast to the Participation Agreement, which is easily available through Amazon's public website, the BSA can be accessed only through "seller subscription pages." ER 138.[3]

<u>Amazon Seller and Plaintiff Mr. Lane</u>

Mr. Lane opened his first Amazon seller account under the Participation Agreement, and never agreed to arbitrate disputes related to that account. ER 260, 341. He opened an Amazon seller account under the assumed name "Austin Flight Check Training Solutions", Seller ID 272503150, in January 2010 ("2010 Account"). ER 260, 347–48. It is undisputed that when Mr. Lane opened the 2010 Account using a "clickwrap" he accepted the terms of the Participation Agreement, and his use of the account was governed by that agreement. ER 14–15, 297. Amazon's Contracts Manager conceded that for the 2010 Account "the marketplace participation agreement would have applied to Mr. Lane." ER 248.

Mr. Lane, a navy veteran,[4] used his Amazon account to sell flight training materials, aviation maintenance training materials, pilot supplies, and aircraft supplies. ER 222, 347. He sold and shipped items using the 2010 Account for more than two years before Amazon abruptly suspended the 2010 Account in late

---

[2] After Plaintiffs filed this lawsuit, and after the district court compelled arbitration, Amazon amended the Participation Agreement by adding the same mandatory arbitration clause that appears in the BSA.

[3] When Amazon's Contracts Manager, Hallie Magrini, was asked about applicability of the Participation Agreement to sellers who signed-up after November 2011, she responded, "When sellers register today the participation agreement is not displayed during registration and acceptance process." ER 154.

May 2012.  ER 260–62 (listing dates the account was active).  Mr. Lane's dispute with Amazon arises out of Amazon's detention of the money he earned on sales made through the 2010 Account.  ER 347–48.

In April 2012, Amazon emailed Mr. Lane, advising him that it had received a complaint about an email he sent to another Amazon seller.  ER 278.  The message said, "For more information, please visit our *Policies*, located in our Help pages online: Help> Selling at Amazon.com…> **Participation Agreement** | Community Rules[.]"  *Id.* (emphasis added).  In May 2012, Amazon emailed Mr. Lane advising him that "we have removed your selling privileges, canceled your listings, and placed a temporary hold on any funds in your Marketplace Payments account."  ER 282.   The email stated "Any new selling accounts you open will be closed."  *Id.*  In Mr. Lane's case, Amazon explained that "[w]e took this action because we recently discovered that you have been conspiring with other sellers to raise prices on certain items."  *Id.*  The message further advised Mr. Lane that "[a]fter 90 days" the hold would be removed and his money would be available "per your settlement schedule."  *Id.*  The email concluded by reiterating that "the removal of your selling privileges is a permanent action."  *Id.*

---

[4] Mr. Lane's email messages to Amazon frequently include the salty language of a sailor.  Mr. Lane's use of profanity—and any impact that may have on his adequacy as a class representative, as discussed by the district court, ER 62—have no bearing on the question of whether he consented to arbitrate his claims; yet Amazon went to great lengths to include all such emails in its motion to compel arbitration.

Later the same day, Amazon sent Mr. Lane a second email stating that "your selling account has been blocked due to violation of the Amazon.com **Participation Agreement**." ER 284 (emphasis added). The message reiterated that his money would not be disbursed until ninety days after the date his account was blocked and that "[a]ny subsequent accounts that are opened will be closed as well." *Id.* The Participation Agreement (and the BSA) state clearly that if a seller's account is terminated, they are to receive their funds the shorter of (a) 90 days after the account was suspended, or (b) the date on which the seller was notified by Amazon that the decision to close the account was final. ER 328, 301. In the form email notifications sent to both Plaintiffs, Amazon unilaterally dispensed with the latter and elected to hold funds 90 days or more.

The Participation Agreement, which does not contain an arbitration clause, still applies to Mr. Lane's terminated 2010 account <u>after</u> Amazon terminated and cancelled Mr. Lane's seller account in May, 2012, locking him out of his account completely, Lane tried unsuccessfully to open new (and different) seller accounts under different assumed names; at that time Amazon was using the newer BSA, which contained an arbitration agreement. ER 260–62. In the process of opening, or attempting to open, those accounts Mr. Lane clicked on a check box indicating that he agreed to the terms of the BSA. ER 32–33. For its part, however, Amazon never agreed to open any of the new accounts, and rebuffed each of Mr. Lane's

efforts to enter into a new contract. *id.*; ER 260–62. Yet Amazon contends that by attempting to contract, Mr. Lane's terminated 2010 Account was somehow resurrected for an instant, amended to require arbitration, and then terminated and cancelled all over again, this time under the terms of the BSA instead of the Participation Agreement.

With one exception, addressed in the following paragraph, Amazon admits these attempts by Mr. Lane to open new and different seller accounts failed because Amazon immediately determined they were related to him and disallowed them "as improper" before they became active. ER 260–62. There is no evidence these so-called attempts by Mr. Lane to apply for new and different seller accounts were agreed to and accepted by Amazon so as to create binding contracts. ER 33. At best, Mr. Lane tried to open new accounts, but Amazon deemed those attempts improper and rejected them. ER 32–33, 260–62.

Another seller account linked to Mr. Lane by Amazon was opened in July, 2012 by "Professional Aviation Training, LLC" (the "LLC"). ER 262. That account was opened under the BSA, and it was used to sell goods for several months.[5] ER 262. Amazon's records reflect that the account was opened and

---

[5] Defendant indicates that it determined that the LLC account was related to Lane in October or November 2012 and "blocked it" so the LLC account was used to sell goods on Amazon.com for approximately 5 months, unlike the other accounts Defendant attributes to Lane, which were deemed "improper" by Defendant and blocked immediately before they ever became active. ER 260–62.

operated by Professional Aviation Training, LLC.  ER 262.  An LLC is a legal entity separate and distinct from any of its individual members.

### Amazon Seller and Plaintiff Ms. Peters

Amazon began using the BSA as the click-wrap agreement on its website on November 3, 2011.  ER 137–38.  Ms. Peters opened her seller account eleven months later, on October 14, 2012.  ER 260.  Ms. Peters cares for her elderly parents and is therefore unable to work outside of her home.  ER 234.  She opened her business selling hard-to-find DVDs online in an effort to generate additional income.  *Id.*; *see also* ER 16.  When she opened her Amazon account she clicked a box stating that she accepted the terms of the BSA.  ER 16.

Not long after Ms. Peters opened her account, Amazon emailed Ms. Peters to advise her that it was "conducting a review of her seller account" and would hold the funds in her seller account during the review.  ER 266.  The next day, Amazon emailed Ms. Peters advising her that "we have removed your selling privileges, canceled your listings, and placed a temporary hold on any funds in your seller account."  ER 268.  The message stated that "[a]fter 90 days" the hold would be removed and her money would be available "per your settlement schedule."  *Id.*  The email further advised her that the action was final and that, "Any new selling accounts you open will be closed."  *Id.*

Ms. Peters promptly responded to all communications from Amazon. She asked what she had done wrong. ER 231. She explained that she needed the funds in her seller account because she had borrowed money from her elderly parents who live on a fixed income to start her business. *Id.* ("If you don't want me to sell on your site, I won't, but please don't keep my money, I borrowed it from my parents. They are on a fixed income. I was supposed to pay them back when I got paid. Please.")

Amazon never gave Ms. Peters any reason for the closure of her account. ER 33–34. After Ms. Peters asked, repeatedly, for an explanation, Amazon sent her an email stating: "We removed your selling privileges because your account failed our review process. Due to the proprietary nature of our business, we do not provide detailed information about this process." ER 270; *see also* ER 224–34. The email further advised her that there was no one she could talk with about her account because "the Seller Performance Team does not offer telephone support" and that "Further correspondence regarding the closure of your seller account may not be answered." ER 270.

After Amazon closed Ms. Peters' account, and well before this lawsuit was filed, Ms. Peters emailed Amazon disputing its decision to hold her earnings for ninety days. ER 226. Her objections were specifically based on the terms of the Participation Agreement*, id.*, a "policy" that Ms. Peters clearly understood to be a

controlling document.  Amazon ultimately held Ms. Peters' funds for ninety-eight days before disbursing them to her.  ER 347.

<u>Amazon continues to incorporate terms of the Participation Agreement into the BSA</u>

But even with the use of the BSA beginning in November 2011, Amazon continued to utilize and display the Participation Agreement on its website. The Participation Agreement was accessible to anyone on the Amazon.com site, and the Participation Agreement was incorporated by reference into the BSA.

All sellers (regardless of whether they signed up as a seller when the Participation Agreement was the click-wrap agreement or the BSA was the click-wrap agreement) would find the Participation Agreement on the "Selling on Amazon.com" page of the site.  ER 172–74.  By clicking on the hyperlinked "Policies and Agreements" topic, the seller is taken to the "**Policies and Agreements**" page, which informs the seller as follows:

> We want you to have the best selling experience possible at Amazon.com. Use the links on this page to find out more about our policies. Make sure to read the Participation Agreement and to check periodically for changes to seller policies and agreement.

ER 176.  One click on the hyperlinked words "Participation Agreement" takes a seller to the same agreement that Plaintiff Lane and all other sellers signed up under prior to November 3, 2011 when the BSA went into use.  ER 179.

There are four contractual provisions particularly relevant to determining whether Plaintiffs agreed to arbitrate their claims against Amazon: (1) the forum selection and choice of law provision in the Participation Agreement; (2) the arbitration clause in the BSA; (3) the integration clause in the BSA; and (4) the BSA's definitions section.  ER 332, 304–07.

The Participation Agreement contains the following forum selection and choice of law provision:

> The laws of the state of Washington govern this Participation Agreement and all of its terms and conditions, without giving effect to any principles of conflicts of laws or the Convention on Contracts for the International Sale of Goods. Any dispute with Amazon or its affiliates relating in any way to these terms and conditions or your use of the Services in which the aggregate total claim for relief sought on behalf of one or more parties exceeds $7,500 shall be adjudicated in any state or federal court in King County, Washington, and you consent to exclusive jurisdiction and venue in such courts.

ER 332.

The BSA, on the other hand, purports to contain an arbitration and class action waiver provision:

> Any dispute with Amazon or its affiliates or claim relating in any way to this Agreement or your use of the Services shall be adjudicated in the Governing Courts, and you consent to exclusive jurisdiction and venue in the Governing Courts, **or, if Your Elected Country is the United States, we both consent that any such dispute or claim will be resolved by binding arbitration as described in this paragraph, rather than in court,** except that you may assert claims in a small claims court that is a Governing Court …We each agree that any dispute resolution proceedings will be conducted only on an individual basis and not in a class, consolidated, or representative action.

ER 304–07.

The BSA also contains an integration clause that provides how to resolve conflicts between the BSA and the terms contained in any incorporated documents:

> *This Agreement incorporates and you hereby accept the applicable Service Terms and the applicable Program Policies*, which Amazon may modify from time to time.  ***In the event of any conflict between this the Program Policies and this Agreement, the Program Policies will prevail***.  .  .  .  This Agreement represents the entire agreement between the parties with respect to the Services and related subject matter described herein and supersedes any previous or contemporaneous oral or written agreements and understandings.

ER 305 (emphasis added).  The BSA, which is a global, umbrella agreement relating to several separate programs worldwide, clearly anticipates that some of the terms and policies in the BSA itself may and will conflict with other, more specific, terms and policies found elsewhere on the Amazon.com site.  ER 301.

Amazon specifically planned for how such conflicts would be resolved.  Amazon's arguments in favor of arbitration run directly counter to its own contract language.

The conflict resolution provision utilizes the phrase "Program Policies."

The BSA defines "Program Policies" as:

> [A]ll terms, conditions, policies, guidelines, rules and other information on the Amazon Site or Seller Central, including those shown on the "Policies and Agreement" section of Seller Central or elsewhere in the "Help" section of Seller Central[6] .  .  .  .

---

[6] "**Seller Central** means the online portal and tools made available by Amazon to you, for your use in managing your orders, inventory and presence on the Amazon.com Site, and any related services we make available."  ER 307.

ER 307.

The term "Amazon Site," as it appears in the definition of "Program Policies," is also a defined term, described as "that website, the primary homepage of which is identified [as] ... the URL www.amazon.com and any Promotion Site that we may make available from time to time (if your elected Country is the United States)."  ER 306.

These definitions broadly charge sellers to read and understand all terms and policies that apply to the activity of selling on Amazon's website. The language used by Amazon to define "Program Policies" expressly encompasses all policies found *anywhere* on the site.  Amazon used the "Policies and Agreement" section of Seller Central or elsewhere in the "Help" section of Seller Central" as an *example* of where such policies could be located, but intentionally elected to make the scope of the policies broader that those appearing in Seller Central (as highlighted by the phrase "including those").

The term "Seller Central" refers to a page on Amazon's site where registered sellers can log-in to check on all activity on her account. ER 307.  According to Amazon, a seller can click on a hyperlink on that unique page and either the Participation Agreement or BSA will appear, whichever agreement that particular seller signed up under.  ER 138–39.  Even so, the BSA's definition of "Program Policies" includes all policies on the "Amazon Site," which, as defined, is

necessarily broader than just the "Seller Central" page. The Participation Agreement can be found in multiple ways, but is housed primarily for all sellers under the *Selling on Amazon.com* page of the site. ER 169–72. Of course, Amazon is solely responsible for both how it drafts the agreement and policies on its site, and the language, definitions, and integration clauses included in those agreements.

As shown by the screen shots below, the Participation Agreement appears on the "Amazon Site" under the "Policies and Agreements" heading of the "Selling at Amazon.com" webpage, and is generally applicable to all sellers. ER 172–79.







And under the language of the BSA, any conflict between the BSA and the Participation Agreement is to be resolved in favor of the Participation Agreement. It is undisputed that the Participation Agreement does not require arbitration and instead permits sellers to sue Amazon in state or federal court in King County, Washington. The BSA, on the other hand contains a mandatory arbitration clause. The two are in direct conflict. According to Amazon's own BSA language, the

conflicting (general) BSA arbitration language is to be jettisoned in favor of the specific Participation Agreement language.

As stated earlier, Mr. Lane's seller account was originated under and governed by the Participation Agreement at all times prior to Amazon's termination of the account in May 2012. But even if it could be argued that Mr. Lane subsequently agreed to the BSA, the same language that negates arbitration in the case of Ms. Peters applies to Mr. Lane also.

### IV.   PROCEDURAL HISTORY

The operative complaint in this matter, Plaintiffs' first amended class-action complaint, alleges that Amazon's policy of retaining funds for up to fourteen days in the ordinary course of business, and for periods exceeding 90 days after Amazon decides to close a seller's account, violates both the terms of its contracts with sellers and Washington law. ER 340–65. Specifically, Plaintiffs allege that when Amazon processes payment card information from buyers and eventually transmits funds to Amazon sellers, it engages in money transmission and its conduct is governed by the Washington Uniform Money Services Act. Wash. Rev. Code § 19.230 *et seq.* ER 342–45. Under the statute, a money transmitter is required to transmit the funds received from a customer to the seller within ten days after receiving the money. *See* Wash. Rev. Code § 19.230.330(1)(a) (2013) (the statute

was amended in 2014 to exempt Amazon, and any entities using a similar business model, from the ten-day requirement).

Amazon sought to compel arbitration.  ER 386.  Amazon provided Plaintiffs with discovery relevant to the arbitration issue and Plaintiffs responded to the motion.  *Id.*  The district court heard oral argument on the motion to compel arbitration.  ER 46–91.  The district court granted the motion in a written order. ER 30–42.  Plaintiffs then moved for dismissal with prejudice of all their claims in order to prosecute this appeal of the district court's order.  ER 388.  The district court granted Plaintiffs' motion and dismissed their claims with prejudice.  ER 26–29.  Plaintiffs timely filed a notice of appeal of the district court's order compelling arbitration.  ER 1.

## V.    SUMMARY OF THE ARGUMENT

The district court's order compelling arbitration contains two legal errors.  First, the district erred in concluding that Mr. Lane contractually agreed to arbitrate claims arising under the 2010 Account when he later tried unsuccessfully to open different accounts under the BSA.  The claims arising under the 2010 Account are controlled only by the Participation Agreement, which does not contain an arbitration provision.  Amazon rebuffed and rejected Mr. Lane's efforts to enter into new agreements under the BSA, and another account opened by a limited liability company, a separate and distinct legal entity from Mr. Lane, is not binding

on Mr. Lane under Ninth Circuit precedent. Because Mr. Lane never contracted with Amazon under the BSA, there can be no enforceable arbitration provision as to Mr. Lane.

Second, the district erred in concluding that the BSA's integration clause does not incorporate the terms of the Participation Agreement, including the Participation Agreement's forum selection clause which sets exclusive venue in the courts of King County, Washington. Amazon bears total responsibility for the wording and interplay of its online seller agreements, and Amazon wrote the BSA in a manner that *first* incorporated the Participation Agreement into the BSA, and *second* deferred to the terms of the Participation Agreement in the event of conflict between the two. Under basic rules of Washington state contract construction and interpretation, neither Mr. Lane nor Ms. Peters agreed to arbitrate their disputes with Amazon.

## VI.     ARGUMENT

This Court reviews de novo the district court's order compelling arbitration. *Murphy v. DirecTV, Inc.*, 724 F.3d 1218, 1224 (9th Cir. 2013). This Court reviews underlying factual findings for clear error. *Lee v. Intelius, Inc.*, 737 F.3d 1254, 1258 (9th Cir. 2013). This Court reviews de novo the interpretation and meaning of contract provisions. *Id.*

The Federal Arbitration Act ("FAA") makes an agreement to arbitrate "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. "Section 2 is a congressional declaration of a liberal federal policy favoring arbitration agreements . . . ." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). Moreover, the FAA establishes that "as a matter of federal law, any doubts concerning the scope of arbitral issues should be resolved in favor of arbitration." *Id.*

Nonetheless, under the Supreme Court's precedents, "a court may order arbitration of a particular dispute only where the court is satisfied that the parties agreed to arbitrate *that dispute*." *Granite Rock Co. Int'l Bhd. of Teamsters*, 561 U.S. 287, 297 (2010) (citing *First Options of Chi. Inc., v. Kaplan*, 514 U.S. 938 (1995)); *see also United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 573, 582 (1960) ("arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit"). This requires a court to "resolve any issue that calls into question the formation or applicability of the specific arbitration clause that a party seeks to have the court enforce." *Id.* "[T]hese issues always include whether the clause was agreed to, and may include when that agreement was formed." *Id.*

As this Court has explained, "The basic role for courts under the FAA is to determine (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Kilgore v. KeyBank Nat. Ass'n*, 718 F.3d 1052, 1058 (9th Cir. 2013) (en banc). Courts generally should "apply ordinary state-law principles that govern the formation of contracts" to determine whether the parties agreed to arbitrate a certain matter. *First Options*, 514 U.S. at 944.

The district court disregarded language in the BSA expressly providing that, in the event of conflict or inconsistency between either the BSA or the COU and seller Program Policies, the *Program Policies control*. Amazon defined the term Program Policies in such a way as to include the Participation Agreement. The district court erred when it found otherwise. The district court's enforcement of the BSA arbitration provision, and rejection of the BSA's integration and conflict resolution provisions, violates basic principles of contract formation and construction.

**A.** **The district court erred in finding that Plaintiff Lane agreed to arbitrate disputes over the 2010 Account**

Both the Supreme Court and this Court have treated with caution attempts to graft mandatory arbitration provisions onto separate written contracts. In *First Options*, the defendant sought to compel arbitration of all disputes between Manual Kaplan, his wife Carol Kaplan, and his wholly owned investment company, MK

Investments, Inc. ("MKI"). 514 U.S. at 940. There were four written agreements between the parties, but only one, which had been signed by MKI, included an arbitration clause. *Id.* at 941. Although it was undisputed that MKI agreed to arbitration, the Court held that the Kaplans were entitled to a court's determination as to whether they agreed to arbitration under any of the contracts. *Id.* at 941–947. In doing so, the Court emphasized that a party cannot be required to submit to arbitration issues it did not specifically agree to arbitrate. *Id.* at 944 ("arbitration is simply a matter of contract between the parties; it is a way to resolve those disputes—but only those disputes—that the parties have agreed to submit to arbitration"); *id.* at 945 ("a party can be forced to arbitrate only those issues it specifically has agreed to submit to arbitration"); *id.* at 947 ("because the Kaplans did not clearly agree to submit the question of arbitrability to arbitration" that question was "subject to independent review by the courts").

Similarly, in *Wagner v. Stratton Oakmont, Inc.*, 83 F.3d 1046, 1049–50 (9th Cir. 1996), this Court concluded that a mandatory arbitration provision included in the contract governing an individual investment account did not bind the individual's partnership to arbitration of disputes arising from its separate account. In *Wagner*, Scott Serven opened an individual brokerage account and signed an agreement that included an arbitration provision. *Id.* at 1047. The provision was broad and provided for arbitration of "controversies between you and [defendant]"

and was applicable to "all matters between you" and defendant, or defendant's agents. *Id.* Subsequently, Wagner/Serven, a partnership in which Serven was a partner, opened a separate brokerage account with defendant, into which Serven transferred $400,000 from his individual account. *Id.* at 1047–48. The defendant sought to compel arbitration of disputes between it and Wagner/Serven on the basis of the arbitration provision contained in the Serven account contract. Emphasizing that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit" and relying state law principles of contract formation, the Court held that the partnership's claims were not subject to arbitration. *Id.* at 1048–50.

*First Options* and *Wagner* involve attempts to compel arbitration based on contracts signed by a person or entity separate from—though closely related to—the party seeking to avoid arbitration. They demonstrate that courts should ensure that a party is not required to arbitrate disputes arising out of one contract on the basis of an arbitration clause in a separate contract.

That requirement is entirely consistent with Washington law, which requires that when the parties have entered into two different written contracts there is no assumption of intent to work a novation, by which the second contract cancels and supersedes the first contract. *Mut. Reserve Ass'n v. Zeran*, 277 P. 984, 987 (Wash. 1929). Instead, the intent of the parties to work a novation must "clearly appear"

- 24 -

or be required by substantial justice. *Id.* Applying this rule, the Washington Court of Appeals has concluded that an integration clause providing, "This Agreement supersedes all prior agreements between the parties" did not necessarily operate to override an arbitration clause found in the first contract between the parties, but not the second one. *Franciscan Med. Grp. v. Premera Blue Cross*, 122 Wash. App. 1045, at *3, 5–6 (2004) (unpublished). The court explained that if the "supersedes all prior agreements" language in the second contact "operates as a standard integration clause" then all payment disputes arising under the first contract would be governed by the dispute resolution provisions therein, regardless of the inconsistent terms of the second contract. *Id.* at *6. The court found this was the case even for payment claims that arose under the first contract but were not filed until after the first contract terminated and the second took effect. *Id.* Only if execution of the second agreement operated as a novation would the parties be required to use the dispute resolution provisions of the second contract. *Id.*

Similarly, in *Hendrick v. Brown & Root, Inc.*, 50 F. Supp. 2d 527 (E.D. Va. 1999), the court rejected an argument that the fourth written employment contract between an employee and his employer required him to arbitrate claims that arose during his employment under the third written contract between the parties. The language of the arbitration clause at issue was broad, applying to "any" claims arising from the "employment of an employee" or "any other matter related to the

- 25 -

relationship between the Employee and the Company." *Id.* at 534. The arbitration

provision also stated that the employee agreed "that any Employment Contract or

any other agreement which is inconsistent with the provisions of . . . the

[mandatory arbitration] Program is absolutely void unless entered into in writing

by the Chief Executive Officer." *Id.* Nonetheless, the court concluded that the

employee's claims, which arose while the third employment contract was in effect,

were not subject to the mandatory arbitration clause in the fourth contract. *Id.* at

538. The court explained that its conclusion that "absent a contractual

manifestation of intent to arbitrate them, arbitration agreements do not reach pre-

existing disputes" was "nothing more than an application of the rules that parties

are bound to arbitrate only those kinds of disputes which they have agreed to

arbitrate." *Id.* at 538 (discussing *Peerless Imps., Inc. v. Wine, Liquor & Distillery

Workers Union Local One*, 903 F.2d 924, 928 (2d Cir. 1990)).

In this case, the district court erred in analyzing the threshold question of

whether Mr. Lane ever agreed to arbitrate claims arising from the 2010 Account as

a question of whether the BSA's arbitration clause encompasses the dispute

between Mr. Lane and Amazon. *See* ER 40–41. Mr. Lane's attempted acceptance

of the terms of the BSA when he tried, unsuccessfully, to open new Amazon seller

accounts after Amazon closed his 2010 Account is not an objective manifestation

of an agreement to arbitrate claims that arose out of and are solely related to his

use of the 2010 Account. *See Granite Rock*, 561 U.S. 299 (quoting *First Options*, 514 U.S. at 943) (arbitration is a way to resolve only those disputes the parties have agreed to submit to arbitration); *Hendrick*, 50 F. Supp. 2d at 533 ("The threshold issue is whether the fourth contract (and the incorporated [arbitration provision]) evince an intent to arbitrate an employee's claims which had accrued before execution of the fourth contract.").

When Mr. Lane signed up as a seller and created the 2010 Account, he agreed only to the terms of the Participation Agreement. ER 31, 297. Amazon's Contracts Manager, Hallie Magrini testified in her deposition that for the 2010 Account "the marketplace participation agreement would have applied to Mr. Lane." ER 248. When Amazon notified Mr. Lane of its "permanent action" closing his selling account, Amazon stated, "your selling account has been blocked *due to violation of the Amazon.com Participation Agreement*." ER 284. Accordingly, Amazon has never disputed the Mr. Lane opened the 2010 Account under the Participation Agreement and that at all times when it was active, the 2010 Account was governed by the Participation Agreement.

Neither the terms of the BSA, nor the circumstances in which Mr. Lane purportedly accepted them, clearly demonstrate an intent to arbitrate preexisting claims arising under the Participation Agreement. The BSA's arbitration clause does not contain any express language regarding retroactivity. ER 304–05. The

clause does, however, apply to "any dispute with Amazon or its affiliates or claim relating in any way to this Agreement or your use of the Services."  ER 304.  Mr. Lane's dispute with Amazon does not relate in any way to "this Agreement," meaning the BSA, because it is undisputed that his 2010 Account was opened under and at all times governed by the Participation Agreement.  When Mr. Lane clicked "I agree" to the terms of the BSA, he was, at most, attempting to establish a new Amazon seller account, and the new sales would be the "Services" and "related subject matter" described in the contract.

Amazon rejected his effort to open new accounts, so no new contracts were ever created between the parties.  Similarly, the active seller account set up by the LLC (attributed by Amazon to Mr. Lane) is not Mr. Lane's account, because the LLC is a distinct and separate legal entity.  Under this Court's holding in *Wagner*, 83 F.3d 1049–50, an agreement by the LLC to arbitrate under the BSA is not binding on Mr. Lane (even if he is a member or manager of the LLC).  Even if Amazon could prove that Mr. Lane agreed to the BSA and its arbitration clause in a subsequent online agreement, such an agreement would not retroactively supplant the Participation Agreement with respect to disputes involving the 2010 Account.

1.     The BSA's Arbitration Provision Does Not Apply Retroactively

The district court concluded that the language making the BSA arbitration provision applicable to "any claim relating in any way to . . . your use of the Services" makes the clause retroactive to Mr. Lane's claims based on the 2010 Account. ER 40–41. As the court in *Hendrick* explained, that reasoning is erroneous because use of the words "any claim" does not make an arbitration provision retroactive. *Id.* at 534–35. This is particularly true where, as here, the parties did not have a continuous business relationship. *Id.* at 536–37. Instead, prior to Mr. Lane's failed attempts to contract with Amazon under the BSA, Amazon had unilaterally terminated its business relationship with Mr. Lane, and unambiguously announced it would not accept any attempts by him to enter into new seller agreements. ER 282–84.

The district court further relied on the BSA's integration clause, which states: "This Agreement represents the entire agreement between the parties with respect to the Services and related subject matter described herein and supersedes any previous or contemporaneous oral or written agreements and understandings." ER 305. There is no reason to conclude, however, that this boilerplate language is anything other than a standard integration clause. *See Franciscan Med. Grp.*, 122 Wash. App. at *6. The effect of the clause is to make the BSA the entire agreement of the parties with respect to the new account that the prospective seller

is attempting to open when he or she accepts the terms of the BSA. It does not demonstrate mutual agreement to render meaningless the parties' prior contract. *Zeran*, 277 P. at 987.

In concluding that the BSA's arbitration clause applied retroactively to Mr. Lane's 2010 Account, the district court relied on two cases which do not apply, much less discuss, Washington law. *Green v. W.R.M. & Associates, Ltd.*, 174 F. Supp. 2d 459 (N.D. Miss. 2001) and *Whisler v. H.J. Meyers & Co.*, 948 F. Supp. 798 (N.D. Ill. 1996). The facts in both *Green* and *Whisler* are distinguishable from those presented here. Neither of those cases involved two written agreements between the parties. *Green*, 174 F. Supp. 2d at 799 (the parties objecting to arbitration argued that when their dispute with defendants arose their relationship with defendants was governed by an oral agreement); *Whisler*, 948 F. Supp. at 461–63 (discussing only one agreement between the parties). Moreover the language of the arbitration provision at issue in *Whisler* was considerably broader than the language here. It applied to "[a]ny controversy arising out of or relating to *any of my accounts*" or "to *this or any other agreement*." *Whisler*, 948 F. Supp. at 800 (emphasis added). In contrast, the BSA's arbitration clause contains no language regarding its application to multiple accounts or disputes arising under other agreements.

In sum, the district court erred when it concluded that Mr. Lane agreed to arbitrate disputes arising out of his 2010 Account. That account was opened under and at all times governed by the Participation Agreement, which contains no arbitration provision. Mr. Lane's subsequent failed attempts to open different accounts under the BSA never rose to the level of binding contracts. Amazon rejected every effort Mr. Lane made to open accounts governed by the BSA. Even if Mr. Lane had entered valid contracts under the BSA, its arbitration clause does not apply retroactively because its terms do not clearly evidence an intent to arbitrate preexisting disputes arising under a separate written contract, as required by both state and federal law.

Finally, at no time did Amazon and Mr. Lane enter into an enforceable agreement governed by the BSA. Only one account that Amazon connected to Mr. Lane was actually opened under the BSA, but that account was with Professional Aviation Training, LLC. That account was opened under the BSA, and used to sell goods for several months.[7] ER 262. However, according to Amazon's records, that account was set up and used by a separate business entity. Amazon makes no attempt to prove (or even suggest) that the LLC was not in fact a limited liability company. As an LLC, this entity has a separate legal existence. The LLC is not

---

[7] Defendant indicates that it determined that the LLC account was related to Lane in October or November 2012 and "blocked it" so the LLC account was used to sell goods on Amazon.com for approximately 5 months, unlike the other accounts Defendant attributes to Lane, which were deemed "improper" by Defendant and blocked immediately before they ever became active.

Lane, even if Lane is a member or manager of the LLC. An individual is not bound to an arbitration contained in a separate agreement opened by a separate legal entity. *Wagner*, 83 F.3d at 1049–50.

**B.      The district court erred in finding that the BSA demonstrated Plaintiffs' agreement to arbitrate**

Amazon maintains both the Participation Agreement and the BSA on its website. That fact is not disputed. ER 138. The BSA contains an arbitration clause, while the Participation Agreement makes the state or federal courts of King County, Washington the exclusive venue for resolution of disputes. *Compare* ER 332 *with* ER 304–05. Because the BSA incorporates by reference the terms of the Participation Agreement, and provides that, in the event of a conflict, the terms of the Participation Agreement control, the district court erred in concluding that the parties had a valid agreement to arbitrate Plaintiffs' claims.

"The purpose of contract interpretation is to determine the intent of the parties." *Navlet v. Port of Seattle*, 194 P.3d 221, 234 (Wash. 2008). The court determines intent "through the objective manifest language of the contract itself." *Id.* When one contract expressly incorporates another, and the terms of the two agreements conflict, a contract provision that addresses which agreement controls should be enforced. *See Brown v. Prime Constr. Co.*, 684 P.2d 73, 76 (Wash. 1984).

The BSA's incorporation clause, on which Amazon relies for its arguments regarding retroactivity, expressly incorporates "the applicable Program Policies" and provides that in the event of conflict between the Program Policies and the BSA, "**the Program Policies will prevail.**" ER 305 (emphasis added). The BSA defines "Program Policies" as "all terms, conditions, policies, guidelines, rules and other information on the Amazon Site or Seller Central, including those shown on the 'Policies and Agreements' section of Seller Central or elsewhere in the 'Help' section of Seller Central . . . ." ER 307. As the Participation Agreement appears on the Amazon Site (as defined in the BSA, ER 304) under Amazon's own definition the Participation Agreement is definitively a "Program Policy." The Participation Agreement is housed on the Amazon website under the "Policies and Agreements" section of "Selling on Amazon.com." ER 137–40; *see also* screen shots, *supra*, at 18. There is no reason to allow Amazon to escape its own contract drafting.

The "objective manifest language" of the BSA incorporates the terms of the Participation Agreement and provides that, in the event of a conflict, the Participation Agreement controls. The Participation Agreement's forum selection clause conflicts with the BSA's mandatory arbitration provision, and under the terms of the BSA's integration clause, the Participation Agreement's forum

selection clause controls.  Accordingly, the district court erred when if found a valid agreement to arbitrate and compelled arbitration.

The district court's opinion set forth several reasons for its conclusion.  Each reason was based on either a factual or legal error.

In reaching its decision, the district court erroneously found that, for sellers who signed up after November 2011 and agreed to the BSA, the Participation Agreement "is simply not available in the Policies and Agreements page or Help page for those sellers who signed up under the BSA." ER 38.  As demonstrated in the record, all sellers may access the Participation Agreement by clicking on the "Policies and Agreements" tab on the page http://www.amazon.com/gp/help/customer/display.html/?nodeId=1161232&_encoding=UTF8 &ref_=hp_other_selling.  After being directed to the page called "Policies and Agreements,"[8] the first choice available is the "Participation Agreement."  Clicking on that link displays the Participation Agreement, which is the very agreement that Plaintiffs rely on in this matter.  ER 94–95.

Contrary to the district court's conclusion, you do not need to "use ... a search engine," or need to be a "Legacy Seller" to reach the Participation Agreement.  ER 38.  To the extent the district court found that the Participation

---

[8] http://www.amazon.com/gp/help/customer/display.html/ref=hp_left_cn?ie=UTF8 &nodeId=1161272.

Agreement was not "readily available to all sellers," ER 38, regardless of when they contracted with Amazon, the district court committed error, as the Participation Agreement is demonstrably the most readily available seller policy on the Amazon Site. In fact, before blocking his account, Amazon sent Mr. Lane an email stating that he was required to abide the very agreement that it now contends is not an applicable Program Policy. ER 278 (emphasis added) ("For more information, please visit our *Policies*, located in our Help pages online: Help> Selling at Amazon.com…> Participation Agreement | Community Rules[.]"). This is the very path Plaintiffs themselves used to demonstrate that the Participation Agreement is in fact a Program Policy under the BSA.

If the district court based its finding not on the fact that the Participation Agreement was generally unavailable (when, in fact, it was generally available), but rather that the Participation Agreement did not appear as a "direct link on the Seller Central site" for those sellers who signed up under the BSA post-11/2011, the district court also committed error by re-drafting the definition of "Program Policies." As discussed earlier, the BSA defines "Program Policies" as "all ... policies ... on the Amazon Site **or** on Seller Central". ER 307 (emphasis added). In reaching its holding, the district court wrote into the BSA the additional, restrictive requirement that the policy be directly accessed from the Seller Central page; in other words, that a "policy appear on the Amazon Site **and** be accessible on Seller

Central."  Such language does not appear in the contract, and the Court's interpretation nullifies the use of the disjunctive "or," and eliminates the import of the clause "all ... policies ... on the Amazon Site."  ER 307.  The district court went well beyond interpreting the agreement; the district court must read a contract in "context," but "context" cannot mean the power to add or change terms.

By changing the terms of the contract, the district court ignored Washington law requiring courts to construe written contracts against their drafters such that the drafter cannot later benefit from "mistakes" that they were in a position to prevent. *See Pierce Cty. v. State*, 185 P.3d 594, 610 (Wash. App. 2008) (ambiguous contracts are generally construed against the drafter); *Emter v. Columbia Health Servs.*, 819 P.2d 390, 392 (Wash. App. 1991) (drafter cannot take advantage of ambiguities it could have prevented with greater diligence); *Cont'l Ins. Co. v. PACCAR, Inc*., 634 P.2d 291, 294 (Wash. 1981) (party who created the contract is in better position to prevent ambiguous language or mistakes).

In determining whether an agreement to arbitrate exists, courts first apply ordinary state law contract principles to decide whether parties have agreed to arbitrate a particular matter. *First Options*, 514 U.S. at 945.  Under Washington law, all contracts, including agreements to arbitrate, are interpreted under the context rule enunciated in *Berg v. Hudesman,* 801 P.2d 222, 228 (Wash. 1990). The "context rule" is the framework for interpreting written contract language

which involves determining the intent of the contracting parties by viewing the contract as a whole, including the subject matter and objective of the contract, all circumstances surrounding its formation, the subsequent acts and conduct of the parties, statements made by the parties in preliminary negotiations, and usage of trade and course of dealings. *Id*. The application of the context rule leads the courts to discover the intent of the parties based on their real meeting of the minds, as opposed to insufficient written expression of their intent. *Olympia Police Guild v. City of Olympia*, 805 P.2d 245 (Wash. App. 1991). <u>Context may not be used, however, to contradict, modify or add to the written terms of an agreement.</u> *Schweitzer v. Schweitzer*, 937 P.2d 1062, 1066 (Wash. 1997). Nor may context be used for the purpose of importing into writing an intention not expressed therein. *Syputa v. Druck Inc*., 954 P.2d 279, 282–83 (Wash. App. 1998). Perhaps Amazon should have written its contract in the manner suggested by the district court (using the word "and" instead of "or"), but the district court was required to apply the definition actually contained in the BSA.

There is nothing to preclude Amazon from requiring sellers to arbitrate their disputes with it, but the contract language it uses to do so must be clear and unambiguous. *See Granite Rock*, 561 U.S. at 297. By choosing to broadly incorporate other documents on the "Amazon Site" by reference (specifically here the Participation Agreement, which clearly appears on the "Amazon Site")

- 37 -

Amazon elected to forego their arbitration rights in favor of permitting Plaintiffs a federal court venue.[9]

In concluding that the Participation Agreement was not a Program Policy, the district court also improperly relied on an inapplicable definition. The district court incorrectly found that the Participation Agreement could not be a "Program Policy" because "in referring to the Participation Agreement, the BSA uses the term 'Seller Agreement.'" ER 20. The court's order then cites to page 22 of the BSA. *Id.* However, that page of the BSA lists the definitions for the Service Terms of the "Fulfillment by Amazon" or "FBA" program, a program in which the Plaintiffs did not participate. ER 321. The introduction to the "FBA" section of the BSA states, "These FBA Service Terms are part of the Amazon Services Business Solutions Agreement ("**Business Solutions Agreement**"), and, unless provided otherwise, ___concern and apply only to your participation in FBA___." ER 317 (emphasis added). The BSA, an omnibus agreement, contains multiple delineated sections: (i) *General Terms* (ER 282-289); (ii) *Selling on Amazon Service Terms* (shown as "S-_" provisions; ER 301–07; (iii) *Webstore Service*

---

[9] To the extent that the district court found an ambiguity as to which venue was proper, the district court erred in not construing the ambiguity against Amazon, the drafter of the agreements. *See Seaborn Pile Driving Co. v. Glew*, 131 P.3d 910, 913 (Wash. App. 2006). Applying this black-letter contact law principle, courts have held that when a party's agreement includes both an arbitration clause and a provision requiring resolution of disputes in a certain court, the resulting ambiguity requires denial of a motion to compel arbitration. *See, e.g., Stephens v. TES Franchising*, No. 301CV2267(JBA), 2002 WL 1608281, at *2–3 (D. Conn. July 10, 2002) (denying motion to compel arbitration); *Christianson v. Poly-America, Inc.*, No. Civ.02-1384(RHK/AJB), 2002 WL 31421684, at *3–4 (D. Minn. Oct. 25, 2002) (denying motion to compel arbitration).

*Terms* (shown as "W-_" provisions; ER 312–17); and (iv) *Fulfillment by Amazon* (shown as "F-_" provisions; ER 317–22).  It was clearly erroneous to find that a definition applying to the *Fulfillment by Amazon* program <u>in which neither Plaintiff participated</u> controlled when no similar definition appears anywhere in the sections of the BSA actually applicable to Plaintiffs (*General Terms* and *Selling on Amazon Service Terms*).  *See generally* ER 301–12.[10]

The district court further misunderstood Plaintiffs' argument to be that any information concerning selling, found anywhere on the Amazon website, is a "Program Policy."  ER 21.  Plaintiffs' argument is not so broad.  Plaintiffs did not seek to graft "*any* information contained in the Amazon site" into the BSA (ER 21, emphasis added); rather, here, the Plaintiffs seek only to bind Amazon to a document that Amazon itself holds out on its "Amazon Site" as a policy.  By the express terms of the BSA, such a policy controls.

Nor is the Participation Agreement buried somewhere in the depths of the "Amazon Site;" rather, it is the agreement one finds most easily if one attempts to research selling on Amazon either by visiting the "Selling of Amazon" section of the Amazon website, or using a search engine such as Google.  ER 92–95, 98–99.

---

[10] The definition on which the district court relied goes on to state that the Participation Agreement is what "permits you to list and sell products via the Amazon website," ER 321, indicating, if anything, that the Participation Agreement, not the BSA, is the agreement that would the dispute between the parties in the event of dispute over the sale of products.

In contrast to the Participation Agreement, which is easily available through Amazon's public website, the BSA can only be accessed through "seller subscription pages." ER 138. As a result, a person who is not a current seller and tries to research the terms and conditions that will apply to them if they sign-up to sell on Amazon will only be able to find the Participation Agreement. When the prospective seller actually goes through the registration process, however, they are asked to accept the BSA.

It does not create an "absurd result" (ER 21) to incorporate by reference a policy that Amazon itself describes as a "Policy." The district court suggested, as a concern, "that a seller would not know to what he or she had agreed, short of reading every screen on the Amazon website and Seller Central (and doing so repeatedly to keep apprised of any changes)." But here the evidence is that Plaintiff Lane knew he was bound to the Participation Agreement because it was his operative agreement, and Ms. Peters knew she was bound to the Participation Agreement because she references it in an email that she sent in connection with Amazon's decision to terminate her as a seller:

> Amazon has decided to suspend my seller account permanently no reason given because for some reason they dont think they need to give reason. They stated this in the correspondence to me. They also stated they were holding my earnings for 90 days. However according to 5.h **of the Participation Agreement** the money is withheld the shorter of 90 days or completion of the review. The review has been completed and am no longer able to sell on Amazon. Therefore am requesting the money be transferred to my bank account immediately.

ER 226. Ms. Peters' writing clearly evidences her understanding that she was bound to the Participation Agreement, and to bind Amazon to it as well. *Berg,* 801 P.2d at 228 (the "context rule" involves determining the intent of the contracting parties by viewing the contract as a whole, including the "subsequent acts and conduct of the parties"). The district court's hypothetical concern about over-inclusive incorporation by reference exceeds the evidentiary bounds of this case, is contrary to the evidence in the record, and should be reversed.

Amazon is a multi-billion dollar corporation. It elected to draft and implement the BSA, elected to incorporate the Participation Agreement, and elected to include language in the BSA that resolved conflicts not in favor of the BSA, but rather in favor of the incorporated document. The district court erred by selectively enforcing one provision of the BSA—the arbitration provision—while disregarding other terms of the BSA that clearly demonstrated the incorporation of the Participation Agreement and the applicability and enforceability of the Participation Agreement's exclusive "federal courts of King County, Washington" venue provision.

## VII.   CONCLUSION

Amazon requires third-party sellers to quickly process and ship orders from buyers. But it is Amazon's practice to hold onto to the funds it has collected from buyers for periods up to fourteen days, and for over ninety days if Amazon

unilaterally decides to revoke a seller's privileges and terminate her account. For individual sellers like Mr. Lane and Ms. Peters, this means they have delivered their product and incurred shipping fees, the buyer has received and is using their product, but Amazon is holding all the money. Because of the volume of third-party sales through the Amazon website, Amazon holds hundreds of millions of dollars belonging to sellers in its own accounts every day. Mr. Lane and Ms. Peters allege that Amazon's conduct violates its contracts with sellers and Washington law. Plaintiffs do not dispute that Amazon could have written contracts that unambiguously required them to accept mandatory arbitration as a condition of becoming Amazon sellers, but Amazon failed to do so. Accordingly, Plaintiffs should be permitted to test the merits of their claims in federal court. For all of the foregoing reasons, Plaintiffs respectfully request that the Court reverse the district court's order compelling arbitration and remand to the district court for further proceedings.

RESPECTFULLY SUBMITTED AND DATED this 1st day of December, 2014.

TERRELL MARSHALL DAUDT
 & WILLIE PLLC


By:  /s/ Beth E. Terrell
     Beth E. Terrell
     Email:  bterrell@tmdwlaw.com
     Jennifer Rust Murray
     Email:  jmurray@tmdwlaw.com
     936 North 34th Street, Suite 300
     Seattle, Washington  98103-8869
     Telephone:  (206) 816-6603
     Facsimile:  (206) 350-3528

     Britton D. Monts
     Email:  bmonts@themontsfirm.com
     THE MONTS FIRM
     The Frost Bank Building
     401 Congress Avenue, Suite 1540
     Austin, Texas  78701
     Telephone:  (512) 474-6092
     Facsimile:  (512) 692-2981

     *Attorneys for Plaintiffs-Appellants*

## STATEMENT OF RELATED CASES

Plaintiffs-Appellants are unaware of any related cases.  *See* 9th Cir. R. 28-2.6.

**CERTIFICATE OF COMPLIANCE
WITH TYPE-VOLUME LIMITATION,
TYPEFACE REQUIREMENTS, AND
TYPE STYLE REQUIREMENTS**

1.      This brief complies with the type-volume limitation of Fed. R. App. P.

32(a)(7)(B) because this brief contains 9,463 words, excluding the parts of

the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because

this brief has been prepared in a proportionally spaced typeface using

Microsoft Word 14 point Times New Roman.

DATED this 1st day of December, 2014.

TERRELL MARSHALL DAUDT
& WILLIE PLLC


By:   /s/ Beth E. Terrell
      Beth E. Terrell
      Email:  bterrell@tmdwlaw.com
      936 North 34th Street, Suite 300
      Seattle, Washington  98103-8869
      Telephone:  (206) 816-6603
      Facsimile:  (206) 350-3528

*Attorneys for Plaintiffs – Appellants*

## CERTIFICATE OF SERVICE

I, Beth E. Terrell, certify that on 1st day of December, 2014, I electronically filed the foregoing document entitled Appellant's Opening Brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the CM/ECF System, which will serve electronic notice of said filing on the following:

> James C. Grant
> Email: jamesgrant@dwt.com
> John A. Goldmark
> Email: johngoldmark@dwt.com
> James Harlan Corning
> Email: jamescorning@dwt.com
> DAVIS WRIGHT TREMAINE LLP
> 1201 Third Avenue, Suite 2200
> Seattle, Washington 98101-3045
> Telephone: (206) 622-3150
> Facsimile: (206) 757-7700
>
> *Attorneys for Defendant-Appellee*

I further certify that I have mailed the foregoing document by First Class mail, postage prepaid from Seattle, Washington, or have dispatched it to a third-party commercial carrier for delivery within three days to the following non-CM/ECF participants:

> None.

DATED this 1st day of December, 2014.

TERRELL MARSHALL DAUDT & WILLIE PLLC


By:  /s/ Beth E. Terrell
     Beth E. Terrell
     Email:  bterrell@tmdwlaw.com
     936 North 34th Street, Suite 300
     Seattle, Washington  98103-8869
     Telephone:  (206) 816-6603
     Facsimile:  (206) 350-3528

*Attorneys for Plaintiffs – Appellants*